IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JOHN L. HANSON                                                                                    PLAINTIFF

V.                              NO. 15-5150

CAROLYN W. COLVIN,
Acting Commissioner of the Social Security Administration                DEFENDANT

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, John L. Hanson, brings this action pursuant to 42 U.S.C. §405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying his claims for a period of disability and disability insurance benefits (DIB) and Supplemental Security Income (SSI) under the provisions of Titles II and XVI of the Social Security Act (Act). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See 42 U.S.C. §405(g).

**I.      Procedural Background:**

Plaintiff filed his application for DIB on June 22, 2012, and his application for SSI on July 3, 2012, alleging disability since October 1, 2011, due to failed laminectomy, spinal stenosis, sciatica, and hypertension. (Tr. 124-131, 165, 168). An administrative hearing was held on December 4, 2013, at which Plaintiff appeared with counsel and testified. (Tr. 22-55).

By written decision dated March 17, 2014, the ALJ found that during the relevant time period, Plaintiff had an impairment or combination of impairments that were severe –

1

post-laminectomy syndrome, obesity, and hypertension. (Tr. 10). However, after reviewing all of the evidence presented, the ALJ determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 11). The ALJ found Plaintiff retained the residual functional capacity (RFC) to:

> lift 20 pounds occasionally and 10 pounds frequently; and stand/walk 4 hours and sit 6 hours in an 8-hour workday. The claimant can occasionally stoop, crouch, crawl, and kneel. The claimant can never climb ladders, ropes, or scaffolds. The claimant can occasionally climb ramps and stairs.

(Tr. (12). With the help of a vocational expert (VE), the ALJ determined Plaintiff was capable of performing his past relevant work as a minister, social worker, and program director. (Tr. 16).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which denied that request on April 30, 2015. (Tr. 1-3). Subsequently, Plaintiff filed this action. (Doc. 1). Both parties have filed briefs, and this case is before the undersigned for report and recommendation. (Docs. 9, 10).

**II.     Evidence Presented:**

Plaintiff was born in 1957, and prior to his onset date of October 1, 2011, underwent lumbar surgery in February of 2007. (Tr. 232). On February 17, 2009, Plaintiff underwent a repeat left L5-S1 discectomy and right-sided L5-S1 interbody fusion, performed by Dr. Bruce J. Nixon. (Tr. 238). Thereafter, until November 9, 2009, Plaintiff continued to suffer from low back pain. (Tr. 247, 248, 251, 252, 253). On November 9, 2009, however, Dr. Nixon reported that Plaintiff felt great and was off all medications. (Tr. 254). Dr. Nixon concluded that Plaintiff had reached maximum medical improvement and that Plaintiff was "quite capable of returning to his regular job without restriction." (Tr. 254). By report dated

2

November 19, 2009, Dr. Nixon again indicated that Plaintiff had reached maximum medical improvement, and had a 9% permanent partial physical impairment to the whole body, and they were "all very pleased with his progress, and I will see him again on a prn basis." (Tr. 255).

On March 11, 2010, Dr. Nixon reported that Plaintiff was pain-free and off all medications until two months prior, was then having recurrent low back pain down his right leg to his right calf, and was taking Percocet for his pain. (Tr. 257). His straight leg raising was 45 degrees, and the power in his lower limbs was normal. (Tr. 257). On May 18, 2010, Plaintiff had a MRI of his lumbar spine, which revealed the following:

1. Surgical level with disc bulge, discectomy device and instrumentation at L5-S1;

2. Facet arthropathy with effusions at L4-5 and shallow disc protrusion extrusion with annular tear. This is right asymmetric with right lateral recess crowding. Canal caliber is borderline;

3. Extraforamina left asymmetric bulge or bulge with protrusion bordering the extraformania left L3 root. Comparison to the prior study of 7/8/09 shows interval evolution of endplate edema at L5-S1 to mild fatty change. L3-4 appearance is stable. L4-5: protrusion/extrusion toward the right appears new/progressed since the prior study.

(Tr. 258).

On June 17, 2010, Plaintiff began seeing Dr. Braxton B. Turner, III, for pain management. (Tr. 260). At that time, Plaintiff had 5/5 normal muscle strength in all muscles and moderate tenderness at 4-5 facets with pain with extension. (Tr. 260). On August 12, 2010, Dr. Turner performed a bilateral S1 selective nerve root blockade. (Tr. 267). The next time Plaintiff saw Dr. Turner was January 27, 2011, and was again complaining of low back pain. (Tr. 269). However, he had 5/5 normal muscle strength in all muscles, with moderate

3

tenderness at 4-5 facts with pain with extension. (Tr. 270). Dr. Turner indicated he was going to refer him to Dr. Nixon to consider further surgical options. (Tr. 270). On February 28, 2011, Dr. Turner changed the Percocet to Lortab, and was going to wean Plaintiff off the narcotics as tolerated. (Tr. 274). Plaintiff was to continue taking the remainder of his medicines. (Tr. 274).

By May 30, 2011, Plaintiff reported to Dr. Turner that all of his symptoms and the pain had improved, and his current pain level was 3 out of 10. (Tr. 279). On June 7, 2011, Dr. Turner reported that overall Plaintiff was content with his current level of analgesia, and wanted to wean off of the Percocet. (Tr. 277). Plaintiff complained to Dr. Turner on August 22, 2011, that his pain level was 8 out of 10, and Dr. Turner ordered a lumbar MRI with and without contrast. (Tr. 282). The MRI was performed on September 12, 2011, which revealed the following:

1. Post-surgical changes at L5-S1 as described above. There is considerable artifact from the metallic hardware;

2. Interval appearance of a small asymmetrical left posterolateral disc bulge at L3-4 into the neural foramen;

3. Mild degenerative retrollesthesis at L4-5 and mild posterior disc bulging, both which appear to be slightly increased from 5/18/10. The spinal canal appears to be at least moderately stenotic at this level, but somewhat difficult to evaluate due to the metallic artifact. Further evaluation of this patient could be obtained with CT myelography.

(Tr. 312-313).

After Plaintiff's onset date (October 1, 2011), on November 1, 2011, Dr. Turner assessed Plaintiff with neuritis, lumbosacral, nos. syndrome; post laminectomy, lumbar; and myalgia/myositis, nos. (Tr. 285). Dr. Turner was going to request to repeat the bilateral L4 nerve root blockade two more times to complete the series of three, stating that the previous

bilateral L4 nerve root blockade provided 30-40% pain relief, but for a transient duration. (Tr. 285).

On February 17, 2012, Plaintiff was seen by Dr. Felipe Garcia, to whom Dr. Turner referred Plaintiff, because he had moved to Texas and needed to establish care for pain management. (Tr. 307). Dr. Garcia assessed Plaintiff with lumbago; postlaminectomy syndrome of lumbar region; thoracic or lumbosacral neuritis or radiculitis unspecified; and incontinence without sensory awareness. (Tr. 310). On March 22, 2012, a CT of Plaintiff's lumbar spine was performed, which revealed the following:

1. L5-S1 fusion with endplate osteophytes causing mild neural foraminal stenosis, most pronounced on the left;

2. Multilevel mild disk and facet degenerative changes and small disk bulges; and

3. Bilateral nephrolithiasis, incompletely assessed is a 6-mm hyperdense lesion within the left renal parenchyma which is nonspecific but could be further characterized with an MRI.

(Tr. 299-300). On March 23, 2012, Dr. Garcia reported that Plaintiff's pain level was 9 out of 10, and was alleviated by narcotics, heat, and massage. (Tr. 293). He assessed Plaintiff with lumbago, postlaminectomy syndrome of lumbar region; thoracic or lumbosacral neuritis or radiculitis unspecified; spinal stenosis of lumbar region; incontinence without sensory awareness; and microscopic hematuria. (Tr. 296). A motor nerve conduction study was performed, and on June 6, 2012, Dr. Garcia reported it was an abnormal study. (Tr. 288). He reported that it was consistent with left L-5 radiculopathy and right S-1 radiculopathy, evidenced by absent left tibial F-wave and an absent right tibial H-wave. Other nerve conduction velocity studies were slower than normal, and a needle EMG revealed early denervation along the right and bilateral L5 and S1 dermatomes. (Tr. 288). Dr. Garcia noted

5

that he would like a second opinion by an orthopedic surgeon, and was referring Plaintiff to Dr. Bruce Bollinger for a surgical opinion. (Tr. 288). There is no indication that Plaintiff ever saw Dr. Bollinger.

On September 25, 2012, non-examining consultant, Dr. Frederick Cremona, completed a Physical RFC Assessment. (Tr. 314). Dr. Cremona found that Plaintiff was capable of performing light work, except he was limited to 3-4 hours combined in standing and walking; could never climb ladder/rope/scaffolds; could frequently balance; and could occasionally climb ramp/stairs; stoop; kneel; crouch; and crawl. (Tr. 315-316).

On October 1, 2012, a US Retroperitoneal Limited study was conducted, which revealed a probable tiny nonobstructing intrarenal calculi bilaterally, and a small 1.5-cm cyst in left kidney without dominant solid mass. (Tr. 351).

On October 8, 2012, Plaintiff was seen by Dr. Justin Vigil. (Tr. 334). Treatment options were discussed with Plaintiff, and he elected to undergo medication management. (Tr. 336). Plaintiff indicated he would consider interventional management in the future, but at that time he had some financial concerns. (Tr. 336). Dr. Vigil started Plaintiff on Opana. (Tr. 336). On November 19, 2012, Plaintiff reported to Dr. Vigil that his pain was moderate. (Tr. 330). Dr. Vigil reviewed the results of the previous drug screen with Plaintiff, and Plaintiff reported that he was not on any medications at that time (Tr. 332). Dr.Vigil assessed Plaintiff with lumbar radiculopathy; chronic pain syndrome; postlaminectomy syndrome, lumbar region; myofascial pain syndrome; and patient visit for long term (current) use of other drugs. (Tr. 332).

On December 7, 2012, Dr. Shabnam Rehman affirmed Dr. Cremona's assessment dated September 25, 2012. (Tr. 322).

On January 10, 2013, Yuri Rivas, CNA, reported that Plaintiff was not getting regular exercise, was complying with his prescribed diet, and felt "well" with minor complaints and decreased energy level. (Tr. 379). On January 11, 2013, Plaintiff saw Dr. Vigil, reporting no relief from the pain and reported the pain was worse since his last visit. (Tr. 325). However, Plaintiff had normal range of motion in all of his lower leg extremity joints; had normal joint stability in all of his lower leg extremities; and had normal muscle strength and tone in all of the muscles of his lower leg extremities. (Tr. 327).

On April 12, 2013, Plaintiff complained to Dr. Vigil of low back pain. (Tr. 323). Overall, Plaintiff reported he felt 20% better, and that his pain was stable since his last visit. (Tr. 323). He was riding an exercise bicycle, and Dr. Vigil encouraged him to continue as tolerated. (Tr. 323).

On May 10, 2013, Plaintiff saw Kevin Gallagher, DO, at Austin Heart, complaining of edema. (Tr. 360). Dr. Gallagher reported that Plaintiff weaned off his pain medications, and since then his edema was getting better, although his blood pressure remained elevated. (Tr. 360).

On May 14, 2013, Dr. Leo C. Tynan assessed Plaintiff with benign essential hypertension, and on May 15, 2013, Dr. Charles E. Burg assessed him with benign essential hypertension and muscle spasm. (Tr. 358).

Plaintiff underwent another MRI of his lumbar spine on June 14, 2013, which revealed postop changes and multilevel degenerative changes, and disk pathology was seen. (Tr. 349).

Plaintiff saw Dr. Felice Howard on July 30, 2013, requesting a refill of oxycodone, due to a flare up of his back pain. (Tr. 352). Dr. Howard only gave Plaintiff a refill for 10

days. (Tr. 354). On August 12, 2013, Dr. Howard reported that although Plaintiff had gotten off the pain medications four months prior, he was unable to get around. (Tr. 345). Plaintiff could no longer afford to go to Dr. Vigil, and was working as a chaplain on an as needed basis at the hospital. (Tr. 345). Plaintiff was going to see Dr. John Friedland, an orthopedist, the next day. On August 13, 2013, Plaintiff saw Dr. Friedland, who assessed Plaintiff with lumbar degenerative disk disease; pseudoarthros synovial/lumbar; other mechanical complication of other internal ortho device implant, and graft; and "post lami syn lumb." (Tr. 415).

A CT of Plaintiff's lumbar spine, performed on September 11, 2013, revealed the following:

1. Postoperative changes consistent with laminectomy and posterior instrumented fusion from L5 to S1 with satisfactory alignment. Posterior lateral endplate osteophytic changes and possible contiguous soft tissue calcifications are seen bilaterally with mild to moderate bilateral neural foraminal stenosis at this level;

2. Mild degenerative changes from L2-3 through L4-5 with possible mild central canal stenosis at L4-5.

(Tr. 413). X-rays of the lumbar spine revealed slight convex curvature of the lumbar spine to the right; postsurgical changes status post L5-S1 fusion, with no radiographic hardware complications; no abnormal motion; and minor disc space narrowing at L4-5. (Tr. 417).

On October 8, 2013, Plaintiff saw Dr. Friedland for follow-up, complaining of pain and bilateral foot numbness, and stating that his right leg pain was greater than the left side. (Tr. 410). Dr. Friedland reported that Plaintiff was noted to have 5/5 motor strength throughout all motor groups in the upper and lower extremities, as well as having normal sensation to light touch in a C5 through T1 distribution, and L1 through S1 distribution bilaterally with a tingling dysaesthesia to light touch on the plantar aspect of both feet. (Tr.

8

410). Plaintiff was assessed with lumbar degenerative disc disease; pseydoarthros Synovial/lumbar; other mechanical complication of other internal ortho device, implant, and graft; and "post lami syn lumb." (Tr. 411). Dr. Friedland noted that Plaintiff could "continue sedentary work." (Tr. 411). He further reported that he could not exclude neuropathy as a cause for bilateral lower extremity edema, as Plaintiff was "morbidly obese" and hypertensive. (Tr. 411). He believed Plaintiff needed closer follow-up with a primary care provider to manage his hypertension and evaluate for PVD/venous stasis. He also recommended revision fusion. (Tr. 411).

On October 11, 2013, Plaintiff saw Dr. Howard, complaining of shortness of breath and coughing. (Tr. 339). His legs were more swollen, and he had gained almost 30 pounds in the previous two months. (Tr. 339). It was noted at that time that he walked with a cane. (Tr. 342). Dr. Howard assessed Plaintiff with dyspnea, and peripheral edema, and increased his Lasix. (Tr. 342). She also diagnosed him with cough, possibly bronchitis, chronic back pain, obesity, renal insufficiency, elevated LFTs, allergies, asthma, hyperlipidemia, peripheral neuropathy, HTN, hemorrhoids, and kidney stones. (Tr. 343).

At the hearing held before the ALJ, Plaintiff testified that he was 6'2" tall and weighed 350 pounds. (Tr. 26). He testified that he stopped working as a chaplain at the hospital around March or April of that year. (Tr. 29). In his capacity as a chaplain, he reported that he attended deaths, helped with grief and loss, counseled grieving patients, and helped people with anticipatory grief. (Tr. 30). He stated that the job involved a lot of walking, visiting patients in their rooms, and attending functions to pray. (Tr. 30). Plaintiff stated that his back problems were the reason he was not able to work, and that he got a cane approximately seven months prior. (Tr. 34). He stated that he walked without the cane

occasionally, but always had it close by. (Tr. 42). He testified that his doctor suggested the possibility of additional surgery, and referred him to a pain specialist, but he had not yet been to the pain specialist. (Tr. 39).

### III.   Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F. 3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F. 3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F. 3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F. 3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§423(d)(1)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are

demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§423(d)(3). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant had engaged in substantial gainful activity since filing his claim; (2) whether the claimant had a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) met or equaled an impairment in the listings; (4) whether the impairment(s) prevented the claimant from doing past relevant work; and (5) whether the claimant was able to perform other work in the national economy given his age, education, and experience. See 20 C.F.R. §§ 404.1520; 416.920. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his RFC. See McCoy v. Schneider, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520; 416.920.

**IV.   Discussion:**

Plaintiff raises the following issues in this matter: 1) The ALJ erred in failing to find Plaintiff did not have an impairment or combination of impairments that meets or medically equals Listing 1.04; 2) The ALJ erred in his RFC determination; 3) The ALJ erred in his credibility analysis; and 4) The ALJ erred in finding that Plaintiff was capable of performing past relevant work as a minister, social worker, and program director. (Doc. 10).

**A.  Listed Impairment:**

Plaintiff argues that his medical impairments meet Listing 1.04. "The burden of proof is on the plaintiff to establish that his or her impairment meets or equals a listing." Johnson v.

11

Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004). "To meet a listing, an impairment must meet all of the listing's specified criteria." Id. "To establish equivalency, a claimant 'must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.'" Carlson v. Astrue, 604 F.3d 589, 594 (8th Cir. 2010)(quoting from Sullivan v. Zebley, 493 U.S. 521, 531 (1990)). "[W]hen determining medical equivalency, an impairment can be considered alone or in combination with other impairments." Carlson, 604 F.3d at 595. The listings delineate impairments considered "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §404.1525(a).

> Listing 1.04 provides:
>
> 1.04 *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equine) or the spinal cord. With:
>
>> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>>
>>    or
>>
>> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
>>
>>    or
>>
>> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness,

> and resulting in inability to ambulate effectively, as defined in 1.00B2b.

Appendix I, Subpart P, Regulation No. 4.

1.00B2b defines inability to ambulate effectively as "an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." Plaintiff argues that the ALJ failed to further develop the record to resolve any alleged inconsistencies, and that Plaintiff routinely had positive straight leg tests, reduced signaling, ineffective ambulation, and radiculopathy.

In his decision, the ALJ discussed Listing 1.04 in detail, noting that while Plaintiff did exhibit findings as those cited by Plaintiff's counsel at the hearing (Tr. 55), there were also normal findings from those very same examinations, including normal gait and 5/5 motor strength in February of 2012 (Tr. 309), normal joint stability in all joints of the lower extremities; normal muscle strength and tone in all muscles of the lower extremities in October of 2012 (Tr. 336); and normal range of motion of all joints in the lower extremities and normal muscle strength and tone in all muscles in the lower extremities in January of 2013. (Tr. 11, 327). The ALJ also noted that the most recent lumbar spine MRI, dated September 11, 2013, showed postoperative changes consistent with laminectomy and posterior instrumented fusion from L5 to S1 with satisfactory alignment, and posterior lateral endplate osteophytic changes. Possible contiguous soft tissue calcifications were seen bilaterally, with mild to moderate bilateral neural foraminal stenosis at this level. There were also mild degenerative changes from L2-3 through L4-5, with possible mild central canal stenosis at L4-5. (Tr. 11, 413). In addition, the ALJ correctly noted that Plaintiff's

13

most recent orthopedist visit to Dr. Friedland, on October 8, 2013, showed negative straight leg raises bilaterally; full range of motion throughout the lumbar spine; normal sensation to light touch from L1 through S1; and 5/5 motor strength. (Tr. 11, 410). Dr. Friedland also noted that Plaintiff had a "fairly normal gait" and was able to demonstrate full range of motion throughout the cervical, thoracic and lumbar spine regions. (Tr. 410). It was only three days later, on October 11, 2013, that Dr. Howard examined Plaintiff and noted that he walked with a cane. (Tr. 342).

The ALJ also considered Plaintiff's obesity, and noted that the limitations he gave in his RFC, such as standing, walking, lifting, carrying and postural limitations, were in part due to obesity. (Tr. 11-12).

Based upon the foregoing, the Court believes Plaintiff has failed to meet his burden of proving his impairments met or equaled Listing 1.04, and therefore, Plaintiff's argument on this issue is without merit.

**Credibility Analysis:**

When arguing that the ALJ erred in his RFC determination, Plaintiff also argues that the ALJ erred in his credibility analysis. The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints

where inconsistencies appear in the record as a whole. Id. As the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).

In his decision, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that his statements concerning the intensity, persistence and limiting effects of the symptoms were not entirely credible for the reasons explained in his decision. (Tr. 14). The ALJ pointed to Plaintiff's use of a cane at the hearing and on October 11, 2013, when he visited Dr. Howard, but that only three days prior, Plaintiff saw Dr. Friedland, who found Plaintiff had a "fairly normal gait" and no mention was made of the use of a cane. The ALJ also referred to the frequent physicians' notations in various records that Plaintiff had normal sensation and 5/5 motor strength, with a normal gait, normal muscle strength, and normal range of motion of all joints in the lower extremities. (Tr. 14).

The ALJ noted that with respect to Plaintiff's hypertension, in September of 2012, he restarted hypertension medications. By January of 2013, Plaintiff had stopped taking his medication, and Yuri Rivas, CNA, advised him to restart medication, lose weight, and exercise. (Tr. 15, 380). Plaintiff was subsequently taken off of Lisinopril by Dr. Howard, and on October 11, 2013, started taking Metoprolol and Furosemide. Dr. Howard also increased his Lasix, because Plaintiff was suffering from swollen legs. (Tr. 342). The ALJ addressed this fact, and concluded that apart from the edema, which did not affect Plaintiff's mobility, in considering the other exam findings, his RFC adequately accounted for any limitations resulting from Plaintiff's hypertension. (Tr. 15).

Although the ALJ did not cite to Polaski, or discuss every credibility factor in depth, the ALJ set forth good reasons for his credibility findings in his decision, including: Plaintiff's ability to work during the relevant time period; the negative findings in the medical opinions; the use and effectiveness of Plaintiff's medications; Dr. Friedland's report that Plaintiff could perform sedentary work; and the inconsistent records regarding Plaintiff's cane usage. The Eighth Circuit has held that the ALJ does not need to explicitly discuss each Polaski factor, and that it is sufficient if he acknowledges and considers those factors before discounting Plaintiff's subjective complaints. Milam v. Colvin, 794 F.3d 978, 984 (8th Cir. 2015) (quoting Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004)(internal citations omitted).

Based upon the foregoing, the Court finds there is substantial evidence to support the ALJ's credibility analysis.

### D. RFC Determination:

Plaintiff argues that the ALJ erred in failing to give controlling weight to the opinion of Dr. John Friedland, Plaintiff's treating orthopedist, noting that Dr. Friedland recommended Plaintiff continue sedentary work, but, ultimately, undergo revision surgery. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). It is assessed using all relevant evidence in the record. Id. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3).

The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id. "The ALJ is permitted to base its RFC determination on 'a non-examining physician's opinion *and* other medical evidence in the record.'" Barrows v. Colvin, No. C 13-4087-MWB, 2015 WL 1510159 at *15 (quoting from Willms v. Colvin, Civil No. 12-2871, 2013 WL 6230346 (D. Minn. Dec. 2, 2013).

As indicated earlier, the ALJ found that Plaintiff had the RFC to perform light work with certain limitations. In making this determination, the ALJ carefully set forth the medical evidence relating to the relevant time period, and addressed the findings of each physician. (Tr. 12-16). The ALJ indicated he gave greater weight to the opinion of non-examining consultant, Dr. Frederick Cremona, dated September 25, 2012.

The Court has already set forth the opinions from the various physicians in the discussion above. The Court agrees with Defendant's conclusion that the ALJ's RFC is consistent not only with Dr. Cremona's opinion, but is also consistent with Dr. Friedland's opinion, who noted that Plaintiff had a fairly normal gait, had full range of motion throughout his lumbar spine, normal motor strength, and negative straight leg raises bilaterally. The fact that Dr. Friedland indicated Plaintiff could return to sedentary work does not, in the Court's opinion, imply that Plaintiff would not be able to perform light work with certain limitations, and is not inconsistent with the ALJ's RFC. In fact, his opinion that

17

Plaintiff would be able to work with an impairment shows that it is not disabling. See Goff v. Barnhart, 421 F.3d 785, 792-93 (8th Cir. 2005)(the fact that the claimant worked with the impairments she claimed were disabling, coupled with the absence of deterioration of her condition, demonstrate the impairments are not disabling in the present).

Based upon the foregoing, the Court finds there is substantial evidence to support the ALJ's RFC determination.

### E. Plaintiff's Past Relevant Work:

Plaintiff argues the ALJ erred in finding Plaintiff was capable of performing past relevant work as a minister, social worker, and program director. Plaintiff argues that the ALJ did not rely on hearing testimony from the VE, but instead "based his decision entirely on state vocational reports lacking any narrative explanation or references to supporting evidence." (Doc. 9 at p. 12). Plaintiff further argues that the ALJ failed to conduct a careful analysis or comparison of Plaintiff's prior work.

In his decision, the ALJ addressed the agency determination of Amanda Molina, dated December 7, 2012, wherein she concluded that Dr. Cremona's assessment did not preclude Plaintiff's ability to perform his past relevant work as a program director, chaplain, minister, and case manager. (Tr. 16, 205). The ALJ also addressed the agency determination of Sharon Menasco, dated September 25, 2012, wherein she concluded that Plaintiff would be able to perform his past relevant work as a chaplain. (Tr. 16, 197). The ALJ concluded that both determinations were sufficient to result in a finding of not disabled. (Tr. 16).

At the hearing, Thomas LaFosse, VE, testified that he had reviewed the exhibits from Plaintiff's file concerning his vocational history, and also heard the testimony, which he

stated was sufficient to allow him to form an opinion of the Plaintiff's vocational status. (Tr. 52). The VE testified that Plaintiff's past relevant work as a minister was classified at light work; the social work position was classified as light work, and the drug court administrator was classified as sedentary. (Tr. 53). The Court believes this hearing testimony supports the ALJ's step four decision that Plaintiff could return to the jobs the VE identified. Accordingly, the Court finds that the VE's opinion constitutes substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments did not preclude him from performing his past relevant work as a minister, chaplain, and case manager.

## IV. Conclusion:

Accordingly, the Court recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice. **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 6th day of April, 2016.

.

*/s/ Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE